UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSA SMITH,

        Plaintiff,

v.

WASHTENAW INTERMEDIATE SCHOOL
DISTRICT, ET AL.,

        Defendants.

_____/

Case No. 17-13571

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
R. STEVEN WHALEN

## OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [62 & 63]

Plaintiff, Rosa Smith, is a 28-year-old woman with cerebral palsy from Ypsilanti, Michigan. Her disabilities are severe, and she cannot walk, care for herself, or articulate complicated speech. In 2003, her parents enrolled her in High Point School in Ann Arbor, which is a school operated by Defendant Washtenaw Intermediate School District ("WISD") for individuals with special needs between the ages of 3 and 26. Nesa Johnson began teaching and caring for Rosa in 2004. In December of 2016, her parents pulled Rosa out of High Point School, because they suspected that Johnson and other WISD staff were abusing her.

Her mother, Doreen Smith, brought this suit as Rosa's guardian against Johnson, two teacher's aides, the principal of High Point School, and WISD. Shortly thereafter, WISD negotiated a termination of Johnson's tenure. Both Johnson and

the WISD Defendants — WISD, Rebecca Whitman, Lisa Correll, and Ann Nakon — have filed Motions for Summary Judgment [62, 63].

## FACTUAL BACKGROUND

Nesa Johnson has worked as a special education instructor since 1988. (Nesa Johnson Dep. 30). She resigned from position with WISD after a negotiated end to her tenure following the commencement of this lawsuit and subsequent investigations.

Rosa Smith ("Rosa") is the only daughter of Chris and Doreen Smith. She has a developmental disability secondary to cerebral palsy and is wheelchair bound. (Dr. Shiener Report, Dkt. 63-25). She can display emotions through sounds and facial expressions, but she can articulate only a few words. (Johnson Dep. 57-58; Dr. Shiener Report, Dkt. 63-25). She has cortical blindness. (Dr. Sewick Report, Dkt. 63-26). Rosa can experience varied and complex human emotions and can understand what is happening in the environment around her. (Johnson Dep. 68-69). While at school, Rosa was in a classroom with 5-6 similarly-disabled students. (Johnson Dep. 152). The class typically had, in addition to Ms. Johnson, the teacher, two teacher's aides. (*Id.*).

Rosa also suffers from various respiratory problems. She can breathe through her nose only laboriously, and she is in constant danger of suffering a buildup of mucus in her airways. (Dr. Sewick Report, Dkt. 63-26). She is accompanied by a

suction machine wherever she goes, and whoever is attending her will sometimes be required to suction mucus out of her airways.

Johnson took over Rosa's care and education in 2004, after her predecessor spilled hot coffee on Rosa. Johnson described working with students like Rosa as follows:

> It's not like a regular ed or a general ed kid like if they want to explore something, touch something, feel something, be goofy, they can do it. My students can't. So I get the joy of bringing it to them, bringing to them the textures and the fun and the movement and activity and, you know, so lesson plans circle around that.

(Johnson Dep. 50).

Several of Johnson's interactions with Rosa form the basis of this lawsuit.

First, on March 24, 2016, Johnson and her aides were using blue painter's tape to decorate the classroom. (*Id.* at 90). According to Johnson and her teacher's aides, Johnson put some tape on Rosa's face as a game or a joke.

Chapman, a teacher's aide, testified about the moment that she witnessed the first piece of tape on Rosa as follows:

> We were laughing. It was fun. Rosa was vocalizing. She put the one piece on and Nesa took it off and Rosa was doing her ah-ah-ah-ah-ah, which in our world means she wanted it back on. We put – she put another piece on. I was working with [another student] at that time but she was laughing and giggling and having fun.

(Chapman Dep. 27-28).

Johnson testified that Rosa was giggling and shook her head to ask for more, but the tape kept falling off because it was painter's tape and Rosa's face was lotioned. (Johnson Dep. 92-94). She testified that when after took the tape off the first time, she asked Rosa if she wanted a picture, and "[s]he was like, 'hey,' so I patted it back on, click, and it fell right back off." (*Id*. at 94).

Lisa Correll and Lisa Chapman were both present in the classroom and both testified that the taping was done in good humor, (Dkt. 68-18) though Chapman did not witness the taping of the mouth. Rebecca Whitham testified that she was between classes that day and had no recollection of the tape incident. (Whitham Dep. 13-14). Johnson sent a text message of the picture with Rosa with tape on her mouth to Rosa's mother with the caption, "Help! She won't be quiet!! 😆 😆." (Dkt. 68-25). Rosa's mother was at a friend's house when she received the text message. She did not respond. (Doreen Smith Dep. pg. 52). She asked Johnson to provide "respite" at least one more time after the incident. (*Id.* at 87). (Respite is at-home care.)

Second, Johnson testified that she would often pat Rosa's face, while Doreen Smith testified that she heard that Johnson had slapped Rosa. Johnson describes the patting as both a greeting and a "tactile sensory" mechanism to teach Rosa that she shouldn't be frightened or hurt by being touched. (Johnson Dep. 161). Her aide, Chapman, described this patting as something that Johnson would do frequently as a greeting or to get her attention. (Chapman Dep. 42). Chris Smith, Rosa's father,

testified that she heard from her bus driver that Johnson had slapped Rosa. (Chris Smith Dep. 21).

Third, Smith testified that Johnson put Rosa in the bathroom to segregate her from the rest of the class on occasion. (Doreen Smith Dep. 128). Johnson testified that she put Rosa in a room that eventually became a bathroom, "prior to it being a bathroom." (Johnson Dep. 73). Johnson testified that her classroom had "a sensory room," which was a dark room with colored lights, where students could go and relax when they were feeling overwhelmed. (*Id.* at 72-75). Rosa would be put in this room occasionally. (*Id.*). Her aide, Chapman, testified that the door was always left sufficiently ajar to see Rosa's face. (Chapman Dep. 40). At some point in 2015, the school repurposed the sensory room into a bathroom. (Johnson Dep. 73-74).

Fourth, Doreen Smith testified that she observed a range of problems with how Rosa returned from school. These problems circumstantially indicate abuse, she alleges. She remembers that Rosa once came home with a scratch on her nose.

> I didn't say who scratched her because I don't know. But I know she came home from school with the scratch on her nose and she was in Nesa's classroom under her care.

(Doreen Smith Dep. 126-27).

Further, one of Rosa's medications caused drowsiness as a side-effect. Doreen Smith thinks that her daughter was provided more medication than prescribed while

at school. Rosa several times came home from school drowsy or having slept on the two-to-three-hour bus ride from Ann Arbor to Ypsilanti. (*Id*. at 148-152).

Further, Doreen Smith testified that her daughter would frequently come home with her coat draped over her shoulders. She alleges that such a haphazard dress in a cold climate caused Rosa to get sick. (Doreen Smith 155-157). Johnson defended herself by noting that sometimes Rosa's muscles would be too stiff to safely manipulate her arms into a coat, and that draping the coat over her shoulders while wrapping her in a blanket was the best that could be done to keep Rosa warm on the bus ride home. (Johnson Dep. 21).

Lastly, Doreen Smith alleges that her daughter would often come home with a diaper so soiled that it had leaked through to her pants. Rosa rode the bus from around 2:25 to 5:00 every afternoon. Her mother reasons that the fullness of the diaper indicated that Rosa was put on the bus with a dirty diaper. (Doreen Smith Dep. 161-164).

Rosa stopped attending High Point in December of 2016. (Adult Protective Services Report, Dkt 62-24). Doreen Smith contacted the school to complain and initiated this suit. Upon receiving the Complaint, the school contacted law enforcement and launched their own investigation. Police investigators interviewed all of the parties involved, but the Washtenaw County Sherriff's Department declined to file charges, finding that there was "insufficient evidence to prove

beyond a reasonable doubt that the suspect intended to commit an assault on a vulnerable adult." (Dkt. 62-21). Johnson was placed on paid administrative leave on February 21, 2017 (Dkt 62-24), and, on June 22, 2017, WISD launched tenure charges against her. (Dkt. 62-25). Johnson and WISD ultimately negotiated an end to her tenure and her resignation from the district.

## PROCEDURAL HISTORY

Plaintiff filed suit on November 1, 2017. [Dkt. # 1]. She filed an Amended Complaint [2] the same day. After receiving leave from the Magistrate Judge to amend her complaint once more, Plaintiff filed a Second Amended Complaint [14] on September 18,2018. A new scheduling order [53] was issued. On April 15, 2019, Defendants Lisa Correll, Anna Nakon, Washtenaw Intermediate School District, and Rebecca Whitman filed their Motion for Summary Judgment [62]. That same day, Nesa Johnson filed her Motion for Summary Judgment [63]. The motions are fully briefed, and a hearing was held on December 18, 2019.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Movant bears the burden of establishing that there are no genuine issues of material fact, which may be

accomplished by demonstrating that the non-movant lacks evidence to support an essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Non-movant cannot rest on the pleadings and must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586-87. Non-movant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Rule 56(e)); *see also United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

## ANALYSIS

Plaintiff's Second Amended Complaint alleges the following causes of action.

Count I: Violation of the Fourth Amendment Right to Be free From Unreasonable Public Seizures
Count II: Violation of the Fourteenth Amendment Right to Personal Security and Bodily Integrity
Count III: Excessive Force in Violation of the Fourth Amendment
Count IV: Excessive Force in Violation of the Fourteenth Amendment
Count V: Battery
Count VI: Violation of Rosa's Right to Equal Protection Under the Law as Guaranteed by the Fourteenth Amendment
Count VII: Violation of Michigan's Social Welfare Act
Count VIII: *Monell* Claim

As a preliminary matter, Plaintiff argues that since Rosa cannot tell her side of the story, the Court should apply heightened scrutiny to Johnson's testimony and look to circumstantial evidence that would tend to discredit her story. *See Scott v.*

*Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). The Court will certainly take into account the unique circumstances of the case when considering the evidence. Ultimately, however, Plaintiff's proposed heightened scrutiny will not be necessary, because Rule 56 provides that summary judgment will not be granted where a reasonable jury could rule for Plaintiff on a material fact question. For purposes of these motions, the Court will not accept as true any testimony that is reasonably controverted by other evidence, even circumstantial evidence.

As a second preliminary matter, Plaintiff in her response brief abandoned her claims against WISD and Anne Nakon. (*See* Dkt. 68, pg. 42).

**Fourth Amendment**

Courts have found that "a student's claim of excessive force by a teacher is properly analyzed under the Due Process Clause of the Fourteenth Amendment, rather than under the Fourth Amendment." *Gohl v. Livonia Pub. Sch.*, 134 F. Supp. 3d. 1066, 1083 (E.D. Mich. 2015), *aff'd Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672 (6th Cir. 2016). Students may sue under the Fourth Amendment for claims arising from actions by school employees that are not excessive force, such as disciplinary searches. *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985). Indeed, "the utilization of the Fourth Amendment analysis for an unreasonable seizure claim not involving the type of physical abuse inherent in an excessive force claim may be

appropriate.*" H.M. v. Bd. of Educ.*, No. 1:14-cv-64, 2015 WL 4624629 * 4 (S.D. Ohio Aug. 3, 2005).

The parties dispute whether this is an excessive force case or a search and seizure case. Plaintiff argues that the taping of Rosa's mouth, which made it difficult for her to breathe or verbally communicate, constituted an unlawful seizure in violation of the Fourth Amendment. A seizure generally occurs when, in view of all the surrounding circumstances, "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988); *see also United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). This analysis is different in a school setting, where students are not free to leave. "To qualify as a seizure in the school context, the limitation on the student's freedom of movement must significantly exceed that inherent in every-day, compulsory attendance." *Couture v. Bd. of Educ. of the Albuquerque Pub. Schs*, 535 F.3d 1243, 1251 (10th Cir. 2008).

Plaintiff argues that the tape on Rosa's mouth restricted her freedom of movement. This is not supported in the record, however. Even taking as true Plaintiff's position that Rosa was not happy when the tape was on her mouth, there is no evidence to undermine the testimony by Johnson and Chapman that the tape was lightly applied to Rosa's face for only a few seconds, as part of a game in which

she was at least perceived to be a willing participant, and that the tape did not pose a threat to her well-being.

The Fourth Amendment in schools is concerned with balancing disciplinary and safety interests with students' privacy interests. This case does not implicate these interests. The gravamen of Plaintiff's case is that of a bodily integrity excessive force case — she argues that Rosa was physically abused. The Fourteenth Amendment therefore provides the proper legal framework. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716 (6th Cir. 1996) (slapping and sexual harassment at school are not actionable under the Fourth Amendment, because they are "premised on the alleged violation of a constitutionally protected liberty interest, within the meaning of the Fourteenth Amendment, in [the students'] personal bodily integrity.").

**Fourteenth Amendment**

 "[I]t is well established that persons have a fourteenth amendment liberty interest in freedom from bodily injury." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir.1996). The test for whether an injury is actionable under the Fourteenth Amendment requires the Court to ask whether the complained-of conduct "shocks the conscience."

> [T]he substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally

shocking to the conscience.

*Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987).

As Plaintiff observes, this standard loosens somewhat when the complained-of conduct is the product of deliberation.

> In situations wherein the implicated state, county, or municipal agent(s) are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action (such as, for example, most occasions whereby corrections officials ignore an inmate's serious medical needs), their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation (such as, for example, a prison riot), public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline[.]

*Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000).

Evaluating cases arising from school settings, courts have found that even where it lacked a legitimate pedagogical purpose, a single slap of a student by a teacher does not "shock the conscience." *Lillard*, 76 F.3d at 725-26. Where a teacher grabbed an elementary student, slammed her head into the blackboard, threw her on the ground, and choked her, all for failing to bring a pencil to class, after which the student exhibited petechiae, neck contusions, and symptoms of post-traumatic stress disorder," the shock-the-conscience standard was met, however. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.,* 455 F.3d 690, 700 (6th Cir. 2006). The standard was also met where a principal broke down a bathroom door in which a

student was hiding, threw her against a wall, and slapped her several times. *Webb*, 828 F.2d at 1154.

It is unlikely that dignitary assaults can ever qualify as violations of the due process clause, even where they might be shocking. *See Sagan v. Sumner Cty. Bd. of Educ.*, 726 F. Supp. 2d 868, 885 (M.D. Tenn. 2010) (holding that forcing a special needs child to smell her own feces did not support a constitutional violation).

The Sixth Circuit has imported the Third Circuit's four-part test as to whether a student's constitutional claim "shocks the conscience."

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c) Was the force applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Domingo v. Kowalski*, 810 F.3d 403, 411 (6th Cir. 2016) (quoting *Gottlieb v. Laurel Highlands Sch. Dist.,* 272 F.3d 168 (3rd Cir. 2001)).

Critically, *Kowalski* involved a case of a special education teacher using cruel methods to manage non-verbal autistic children. The Sixth Circuit noted that although *Gottlieb* involved corporal punishment, it "provides a useful, though not necessarily exhaustive, list of factors to balance in evaluating a student's claim that a teacher's educational and disciplinary techniques violated the Fourteenth Amendment." *Id.*

a. Pedagogical Justification

The stated purpose of the painter's tape incident, according to Johnson and Chapman, was to provide the sort of tactile experience that could desensitize Rosa. Plaintiff makes much of the fact that Johnson had at times called the taping "a joke." (Johnson Dep. 93). That being said, even as a poorly contrived joke, the taping was clearly a part of a broader pedagogical strategy of providing tactile experiences to students. Johnson testified as follows:

> I remember watching our general ed kids, our volunteers, this was a couple of months before doing this with Rosa, and they were playing with the blue painter's tape and they were taking it and wrapping it around their fingers like we would have done as kids and one day the same kids had taken the Elmer's glue and painted their hands which I remember doing and, you know, when you try to pull it off.
> Those are things my students can't do. So, you know, I would do the same, like take Elmer's Glue and paint their hands, let it dry, you know, and take it off and anything that their peers could do that was safe, you know, we would try to be like them and bring it to them. So anything that I could think of to get them to smile or to giggle or to be engaged, we would do it.

(Johnson Dep. 159).

If Johnson was playing a joke only for her sake, or for her and Doreen Smith's amusement, the taping would lack a pedagogical justification. There is no evidence in the record, however, to cast doubt on Johnson's and her aides' testimony that the goal of the exercise was to "engage" Rosa. (*See* Chapman Dep. 29).

b. Use of Excessive Force

The second prong turns on the proportionality of the use of force to the goals. Plaintiff observes that Rosa was completely powerless to remove the tape from her

own mouth or protest its use, and so any use of force would be excessive. She also observes that Rosa had severe respiratory problems and could die if her airways were blocked. Johnson testified that because the tape easily fell off Rosa's mouth, and because Johnson was right in front of her, Rosa was in no danger. (Johnson Dep. 97-98).

The parties dispute whether Rosa enjoyed the activity or not. Rosa, of course, is unable to testify on her behalf. Plaintiff has mustered a number of third-party statements and testimony to the effect that Rosa looked upset in the picture. (*See* Dkt. 77). There is certainly a fact question as to Rosa's subjective understanding of the experience. It is not fact question material to the outcome of the case, however. Even if Rosa were upset by the activity, the taping would not rise to the level of excessive force absent some negative impact on her physical well-being or bodily functions.

c. Good faith or malicious

Plaintiff has produced no evidence that Johnson acted in bad faith or with malice. Even taken in the light most favorable to Plaintiff, the taping of Rosa's mouth was a crudely executed joke, but it still fit within the broader pedagogical goal of increasing Rosa's tactile awareness and engagement. Ill-advised and insensitive though the taping may have been, there is no evidence on the record that it arose from malice, anger, or a desire to harm Rosa.

d. Serious Injury

There was no serious injury resulting from the taping. Plaintiff cites a district court opinion holding that in the case a teacher who places a sharp object under the fingernails of a special-needs student, because there was no disciplinary justification, the lack of a serious injury did not preclude the activity from shocking the conscience. *Sagan*, 726 F.Supp.2d. at 885. Sadism will certainly be conscience-shocking, especially when judged on a Rule 12(b)(6) standard as in *Sagan*, but the taping incident, as discussed above, was not motivated by a desire to cause pain, unlike the sharp objects under the fingernails discussed in *Sagan*. *Id.* ("[T]he court cannot imagined any legitimate reason for any teacher ever to place "something sharp"—even if just her fingernails—under a child's fingernails.").

Looking to these four factors and interpreting the evidence in the light most favorable to Plaintiff, the taping incident may not have been well-crafted to its pedagogical goals. The testimonial evidence does nothing to impugn the teachers' motives, however. The Court has no evidentiary basis to doubt that Johnson used the painters' tape in a good faith effort to engage with a student who required tactile and physical forms of engagement. The taping of Rosa's mouth does not shock the conscience and therefore cannot be the basis of a substantive due process cause of action.

None of the Plaintiff's other causes of action come close to conscience-shocking. Plaintiff alleges that Rosa was locked in the bathroom. Plaintiff produces no evidence, however, that Johnson used the sensory room as such after it became a bathroom. Rosa's mother testified that she spoke to Johnson on the phone on an indeterminate date, and Johnson said that Rosa was in the bathroom because she had been sick. (Doreen Smith Dep. 127). Smith testified that Johnson had told her that Rosa was placed in the bathroom to be punished, but provides only the haziest recollection at how she arrived at this conclusion. (*Id.* at 127-129). Smith had only ever seen the sensory room before it was turned into a bathroom. (*Id.* at 138). It is unclear if the bathroom that was discussed when Smith called the school was even the same room that Johnson had previously used as a sensory room. There is simply no evidence on the record to support Plaintiff's lurid allegations that Rosa was locked in the bathroom.

Plaintiff also alleges that Johnson slapped Rosa. Chapman testified that Johnson patted Rosa's face throughout the day because Rosa had "touch and sensory issues" that the patting addressed. (Chapman Dep. 53). Chris Smith testified a bus driver, Angela Gibbs, told him that she saw "the teacher" slap Rosa. (Chris Smith Dep. 21). Angela Gibbs testified that she generally saw Rosa's teacher pat her face, but that on one day she heard the pat, "heard it loud, and it startled [her]." (Angelina

Gibbs Dep. 14). Gibbs testified that on other days she did not hear that patting, but that particular day it was audible and startling. (*Id.* at 15-16).

Even if Plaintiff were able to prove that Johnson did smack Rosa in front of Gibbs, she would still fail to make out a case for a constitutional violation. The Sixth Circuit has been very clear that "it is simply inconceivable that a single slap could shock the conscience." *Lillard*., 76 F.3d at 726.

Plaintiff further alleges that Defendants failed to change Rosa's diaper and properly dress her for her bus ride home. She bases the first of these allegations on her mother's testimony that when Rosa returned home following her two-to-three-hour bus ride, her diaper was soaked through. (Doreen Smith Dep. 164-68). Smith also testified that Rosa returned home with her jacket draped over her, despite freezing temperatures. (*Id.* at 160). Johnson testified that she wrapped Rosa in a blanket and draped the jacket over her to avoid the potential for injury that arose when one tried to force Rosa's arms into the sleeves of the jacket on "days that her muscles were extremely tight." (Johnson Dep. 21). Whether Rosa was properly attended to for these bus rides home is a disputed matter of fact. It is not a material dispute however, because even if Rosa were put on the bus with an unclean diaper and insufficient clothing, her caregivers' oversight would not shock the conscience. There is no evidence of malice, serious injury, or excessive force. Oversights of

hygiene and dress for dependent students cannot all rise to the level of constitutional violations.

Plaintiff also alleges that Rosa was scratched on her face and improperly medicated. An incident report was filed for a scratch on Rosa's nose on September 19, 2016. (Dkt. 62-28). Johnson testified Rosa was on the mat table stretching, and when she turned around to look back at her "she had a gouge on her forehead and she had some blood under her fingernail." (Johnson Dep. 88). Plaintiff argues in response that Rosa's nails are always trimmed, and that she cannot reach her face with her hands. Defendants dispute both of these propositions. Ultimately, however, Plaintiff's claim is deficient, because there is no evidence to suggest who might have caused the scratch on Rosa's nose, even if Rosa herself could not have.

Similarly, Plaintiff alleges that Rosa was overmedicated, because she often returned from school tired or asleep on the bus. (Doreen Smith Dep. 148-152). One of her medications caused drowsiness as a side-effect. (*Id.*). Johnson disputes that she ever gave Rosa medication other than when prescribed. (Johnson Dep. 66). Again, Plaintiff has only the flimsiest of circumstantial evidence that someone may have overmedicated Rosa.

Even if Plaintiff were able to establish that the scratches, wet diaper, and overmedication were the fault of WISD employees, she would still be unable to prove to a jury which employees were individually at fault. Qualified immunity will

apply when the injury Plaintiff alleges is taken by the collective action of Defendants, not individual defendants. *See Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (individual officers are entitled to qualified immunity even when they collectively had sufficient knowledge to figure out that they were violating the plaintiff's clearly established constitutional rights).

Plaintiff also pled that Defendants violated her Fourteenth Amendment rights by denying her equal protection under the law. Plaintiff alleges that she was treated worse than non-disabled students. (*See* Compl. ¶ 129). The Equal Protection Clause requires public institutions to "treat similarly situated individuals in a similar manner." *Gutzwiller v. Frank*, 860 F.2d 1317, 1328 (6th Cir. 1988). Defendants argued that Plaintiff cannot demonstrate disparate treatment, because there is no evidence that any defendants treated similarly situated non-disabled students better than Rosa. "In opposition to a motion for summary judgment, it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir. 1996). Plaintiff in her response did not attempt to make such a showing. Summary judgment is therefore warranted on her equal protection claim.

## CONCLUSION

Defendants' conduct may have violated school procedures, modern pedagogical standards, and common sense. Plaintiff has not shown, however, that

she could prove at trial that their conduct violated the Fourth or Fourteenth Amendments of the United States Constitution. The Court declines to retain supplemental jurisdiction over Plaintiff's remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3). Count V and Count VII are dismissed only without prejudice. Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment [62] brought by Lisa Correll, Anne Nakon, Washtenaw Intermediate School District, and Rebecca Whitham is **GRANTED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment [63] brought by Nesa Johnson is **GRANTED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: January 24, 2020            Senior United States District Judge